USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/18/19

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
UNITED STATES OF AMERICA,          :

                        :

          Government,    :

                        :

    - against -             :

                        :

JEFFREY EPSTEIN,           :

          Defendant.     :
-------------------------------------------------------------x

19 CR. 490 (RMB)

**DECISION & ORDER**
**REMANDING DEFENDANT**

**A. Background**

This ruling follows the Court's bail hearing held on July 15, 2019. The issue before the Court is whether the Defendant should continue to be remanded (incarcerated) pending trial or whether he should be granted release while the case proceeds. No matter the answer to this question and no matter what has been said in Court in analyzing the matter, this is a criminal case and the Defendant, Jeffrey Epstein, is innocent of the Federal charges alleged against him now and until such time, if it comes, that a jury or the Court finds (after fair and thorough consideration of the facts and the law) that he is guilty. See Transcript, dated July 8, 2019 ("7/8/19 Tr."), at 2-3; Transcript, dated July 15, 2019 ("7/15/19 Tr."), at 40. It should also be borne in mind that the Court has not (yet) been presented with a motion to dismiss the Indictment.

This is a federal as opposed to a state case. We proceed under federal law and federal rules. The key federal statute that applies here is 18 U.S.C. § 1591 which sets forth the crime of sex trafficking with which Mr. Epstein is charged. Mr. Epstein is also charged with conspiring with others to commit sex trafficking under 18 U.S.C. § 371.

With respect to the issue of remand versus release, 18 U.S.C. § 3142 applies. It sets forth a presumption in favor of remand, an exception to the presumption in most cases which favors

pretrial release. § 3142 states that: "if there is probable cause to believe that the person committed . . . an offense involving a minor victim under section . . . 1591," then **"it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."** 18 U.S.C. § 3142(e)(3)(E) (emphasis added); see United States v. Martir, 782 F.2d 1141, 1144 (2d Cir. 1986). The Indictment in this case was returned by a grand jury thus establishing probable cause that the defendant committed the crimes of sex trafficking and sex trafficking conspiracy. See United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985) ("[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)"). In most federal cases the rebuttable presumption that applies favors pretrial release, not remand.

There is another very important issue to be considered in this case. It has to do with "victims" of the crimes charged in the Indictment. Victims refer to the "minor" girls who are alleged to have been sexually trafficked by the Defendant. Under 18 U.S.C. § 3771, victims are entitled to be heard in court, including on the question of whether the defendant is to be released or remanded. Victims have, among other things, been given the opportunity to testify at the bail hearing.

### B. Counsels' Submissions

The Government's letter application, dated July 8, 2019, requests that the Court remand Mr. Epstein. It argues that Mr. Epstein "poses [] an acute danger to the community" and, grounded in past experience with this Defendant, that "if [Mr. Epstein is] allowed to remain out on bail, the defendant could attempt to pressure and intimidate witnesses and potential witnesses in this case, including victims and their families, and otherwise attempt to obstruct justice." Dkt.

2

11, Ex. 1 at 1. The Government also contends that "[i]n light of the strength of the Government's evidence and the substantial incarceratory term the defendant would face upon conviction [45 years], there is an extraordinary risk of flight, particularly given the defendant's exorbitant wealth, his ownership of and access to private planes capable of international travel, and his significant international ties." Id.

The Government also provides the following background information: "In or about 2005, the defendant was investigated by local police in Palm Beach, Florida, in connection with allegations that he had committed similar sex offenses against minor girls. The investigation ultimately also involved federal authorities, namely the U.S. Attorney's Office for the Southern District of Florida and the FBI's Miami Office, and included interviews with victims based in the Palm Beach area, including some of the alleged victims relevant to Count One of the instant Indictment. In the fall of 2007, the Defendant entered into a non-prosecution agreement ("NPA") with the Southern District of Florida in connection with the conduct at issue in that investigation, which the non-prosecution agreement identified as including investigations into the defendant's abuse of minor girls in the Palm Beach area." Id. at 3. "In June 2008, the defendant pled guilty in [Florida] state court to one count of procuring a person under the age of 18 for prostitution, a felony, and one count of solicitation of prostitution, [also] a felony. As a result, the defendant was designated as a sex offender with registration requirements under the national Sex Offender Registration and Notification Act." Id.

The Defense moved on July 11, 2019, for pretrial release of Mr. Epstein, arguing that "Mr. Epstein's strict compliance with the various monitoring requirements associated with his sex-offender registration actually decrease[s] any danger that he might otherwise pose" and also that "Mr. Epstein has never once attempted to flee the United States." Dkt. 6 at 1, 12. The

3

Defense proposes what they describe as "a stringent set of [14] conditions that will effectively guarantee [Mr. Epstein's] appearance and abate any conceivable danger he's claimed to present." Id. at 1. The 14 conditions do not include private security guards 24/7. The 14 conditions do include: (1) "Home detention in Mr. Epstein's Manhattan residence, with permission to leave only for medical appointments as approved by Pretrial Services, including (at the Court's discretion) the installation of surveillance cameras at the front and rear entrances to ensure compliance"; (2) "Electronic monitoring with a Global Positioning System"; (3) "An agreement not to seek or obtain any new passport during the pendency of this matter"; (4) "Consent to U.S. extradition from any country and waiver of all rights against such [e]xtradition"; (5) "A substantial [unspecified] personal recognizance bond in an amount set by the Court after reviewing additional information regarding Mr. Epstein's finances . . . ."; (6) "The bond shall be secured by a mortgage on the Manhattan residence, valued at roughly $77 million. Mr. Epstein's private jet can be pledged as further collateral"; (7) "Mr. Epstein's brother Mark will serve as a co-surety of the bond, which shall be further secured by a mortgage on Mark's home in West Palm Beach, Florida. Mr. Epstein's friend David Mitchell will also serve as a co-surety and pledge his investment interests in two properties to secure the bond"; (8) "Mr. Epstein shall deregister or otherwise ground his private jet"; (9) Mr. Epstein "shall demobilize, ground, and/or deregister all vehicles or any other means of transportation in the New York area, providing particularized information as to each vehicle's location;" (10) "Mr. Epstein will provide Pretrial Services and/or the government random access to his residence"; (11) "No person shall enter the residence, other than Mr. Epstein and his attorneys, without prior approval from Pretrial Services and/or the Court"; (12) "Mr. Epstein will report daily by telephone to Pretrial Services (or on any other schedule the Court deems appropriate)"; (13) "A Trustee or Trustees will be appointed to

4

live in Mr. Epstein's residence and report any violation to Pretrial Services and/or the Court";
(14) "Any other condition the Court deems necessary to reasonably assure Mr. Epstein's
appearance." Id. at 3-4. The Defense also proposes as a "fallback" "round-the-clock, privately
funded security guards [which] will virtually guarantee - not just reasonably assure - Mr.
Epstein's presence in the circumstances of this case." Id. at 10. The bail package originally was
not accompanied by a financial statement reflecting Mr. Epstein's finances. However, on July
12, 2019, the Defense filed a one-page document which includes five groups of assets owned by
Mr. Epstein totaling $559,120,954. Dkt. 14 at 18.

The Government responded to the Defense motion on July 12, 2019, arguing, among
other things, that Mr. Epstein "has a history of obstruction and manipulation of witnesses,
including . . . as recently as within the past year, when media reports about his conduct [in
Florida] reemerged." Dkt. 11 at 1. The Government filing was made against a "backdrop of
significant—and rapidly-expanding—evidence, serious charges, and the prospect of a lengthy
prison sentence." Id. It contends that the defendant's proposed conditions of release are
"woefully inadequate." Id.

The Court also received a letter from the Government, dated July 16, 2019, providing,
among other things, details about allegedly suspicious payments made by the Defendant in 2018;
a Palm Beach, Florida police report; Mr. Epstein's expired Austrian passport in another name but
with Mr. Epstein's photo; and a pile of cash and diamonds found in Mr. Epstein's safe. For
example, the Government says: "[R]ecords from Institution-1 show that on or about November
30, 2018, or two days after the series in the Miami Herald began, the defendant wired $100,000
from a trust account he controlled to . . . , an individual named as a potential co-conspirator."
Dkt. 23 at 1. And, "on or about December 3, 2018, the defendant wired $250,000 from the same

5

trust account to . . . , [an individual] who was also named as a potential co-conspirator." Id. at 1-2. According to the Government, the second individual "is also one of the employees identified in the Indictment, which alleges that she and two other identified employees facilitated the defendant's trafficking of minors by, among other things, contacting victims and scheduling their sexual encounters with the defendant at his residences in Manhattan and Palm Beach, Florida." Id. at 2.

By letter, dated July 16, 2019, Defense counsel states, among other things, that the Court should reject the idea that "there's literally nothing a person of Epstein's means could say, do or pledge to rebut the operative presumption and make himself eligible for release." Dkt. 24 at 2. "Epstein contends that § 1591 and the concomitant remand presumption do not contemplate or cover the core conduct at issue here: performing sexual massages for money." Id. at 1-2 n.1. Defense counsel also states that "Epstein certainly recognizes the Court's request for further transparency and is committed to providing a complete and accurate disclosure. Accordingly, we propose that the Court preliminarily accept the initial [financial] disclosure proffered last Friday and, if intending to grant bail, include a release condition directing Epstein to tender a comprehensive forensic accounting of his finances as expeditiously as practicable." Id. at 4. By letters, dated July 16 and July 17, 2019, Defense counsel also submitted information regarding Epstein's New Mexico sex offender registration status. Defense counsel also stated that Epstein traveled extensively over the last eight months and "invariably returned to the to the United States. That inescapable reality emphatically proves he won't flee and entitles him to release – on any and all conditions the Court deems appropriate." Id. at 8.

### C. Indictment

A grand jury voted to indict Mr. Epstein on or about July 2, 2019. The Indictment charges Mr. Epstein with two felonies involving minor girls some as young as 14. Count I includes conspiracy to commit sex trafficking of minor girls, in violation of 18 U.S.C. § 371, and Count II includes sex trafficking of minor girls, in violation of 18 U.S.C. § 1591. It states: "[F]rom at least in or about 2002, up to and including at least in or about 2005, Jeffrey Epstein, . . . enticed and recruited, and caused to be enticed and recruited, minor girls to visit his mansion in Manhattan, New York . . . and his estate in Palm Beach, Florida, . . . to engage in sex acts with him, after which he would give the victims hundreds of dollars in cash." Indictment, dated July 2, 2019 ("Indictment"), ¶ 2. "Moreover, and in order to maintain, and increase his supply of victims, Epstein also paid certain of his victims to recruit additional girls to be similarly abused by Epstein. In this way, Epstein created a vast network of underage victims for him to sexually exploit in locations including New York and Palm Beach." Id.

The Indictment also charges that "the victims . . . were as young as 14 years old at the time they were abused by [Mr. Epstein] . . . and were, for various reasons, often particularly vulnerable to exploitation." Id. ¶ 3. "Mr. Epstein intentionally sought out minors and knew that many of his victims were in fact under the age of 18, [] because, in some instances, minor victims expressly told him their age." Id.

Following his arrest, on Monday, July 8, 2019, Mr. Epstein was arraigned and presented with the Indictment by Magistrate Judge Henry Pittman.

### D. Legal Principles Governing Release Versus Remand

Under the Bail Reform Act, 18 U.S.C. § 3142, a Court can order a defendant's detention if it determines that the defendant is either (1) a danger to the community or (2) a risk of flight.

18 U.S.C. § 3142(e). A Court does not need to find both bases are proven to order a defendant's detention. See id.; United States v. Blanco, 570 F. App'x 76, 78 (2d Cir. 2014). Dangerousness means that the defendant is a "danger to the safety of any other person or the community." 18 U.S.C. § 3142. A finding of dangerousness must be supported by clear and convincing evidence. See, e.g., United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). "Where there is a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate." United States v. Chimurenga, 760 F.2d 400, 403 (2d Cir. 1985). "[E]ven a single incident of witness tampering . . . [may be] sufficient to revoke bail." LaFontaine, 210 F.3d at 134.

To order detention based upon risk of flight, the Court must find by a preponderance of the evidence that "that no conditions could reasonably assure the defendant's presence at trial." See, e.g., United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); 18 U.S.C. § 3142. "[T]he constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others, while in the latter case, release risks only the loss of a conviction." United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting United States v. Orena, 986 F.2d 628, 631 (2d Cir. 1993)). A bail package that "may reasonably assure the appearance of [the defendant] at trial will not [necessarily] assure the safety of the community." United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991).

The Bail Reform Act sets forth the following four factors to be considered in the release/remand analysis: (1) the nature and circumstances of the crime(s) charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including the person's character and financial resources; and (4) the seriousness of the danger posed by the

8

defendant's release. 18 U.S.C. § 3142(g). "The weight afforded to each factor under section 3142(g) is within the 'special province' of the district court." United States v. Paulino, 335 F. Supp. 3d 600, 610 (S.D.N.Y. 2018) (quoting United States v. Shakur, 817 F.2d 189, 196 (2d Cir. 1987)).

"The rules concerning admissibility of evidence in criminal trials do **not** apply to the presentation and consideration of information at the [release/remand] hearing." 18 U.S.C. § 3142(f)(2) (emphasis added). For example, the Government is entitled to present evidence supporting remand by way of proffer, among other means. 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000) ("bail hearings are typically informal affairs, not substitutes for trial or even for discovery"). 18 U.S.C. § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. United States v. Abuhamra, 389 F.3d 309, 321 n.7 (2d Cir. 2004) "District courts [are afforded] wide discretion regarding the scope of such hearings . . . ." United States v. Bartok, 472 F. App'x 25, 27 (2d Cir. 2012).

### E. The Presumption of Remand in 18 U.S.C. § 1591 Cases

A 18 U.S.C. § 1591 case involving sexual victimization of a minor is unusual in that it includes a presumption in favor of pretrial detention, reflecting the significant harm caused by such a crime. 18 U.S.C. § 3142(e)(3)(E). The presumption is that no condition or combination of conditions will reasonably assure against flight or danger to the community. United States v. English, 629 F.3d 311, 319 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(3)(E)). Mr. Epstein may rebut the presumption by "coming forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). The Government retains the "ultimate burden of persuasion" that Mr. Epstein presents a danger to the

community (by clear and convincing evidence) and that Mr. Epstein presents a risk of flight (by a preponderance of the evidence). Id. Even if rebuttal evidence is presented, "the presumption favoring detention does not disappear entirely." Id. at 436. "[It] remains a factor to be considered among those weighed by the district court." Id.

### F. Mr. Epstein Poses a Danger To Others And To the Community

The Court begins with "dangerousness" because that concept is at the heart of this case. It finds that the Government has shown by clear and convincing evidence that Mr. Epstein threatens the safety of another person and of the community, as follows on pages 10-21:

- **Victims Have Advised The Court That They Would Fear For Their Safety If Mr. Epstein Were Released**

Victims have "specifically conveyed" to the Government that any form of release of the Defendant, including home detention with full-time private guards, could "result in [their] harassment and abuse." Dkt. 11 at 4. At the bail hearing on July 15, 2019, two victims movingly testified about their past sexual encounters with Mr. Epstein when they were minors aged 14 and 16, respectively. 7/15/19 Tr. at 72; see also S. REP. 108-191 ("CVRA Legislative History"), at 22 (In enacting the CVRA, Congress stated that "[V]ictims deserve the right to be heard at specific points in the criminal justice process," including bail hearings. "Giving victims a voice not only improves the quality of the process but can also be expected to often provide important benefits to victims."). Ms. Annie Farmer was introduced by her counsel, David Boies, and stated that she was 16 years old when she "had the misfortune of meeting Jeffrey Epstein [in] New York." 7/15/19 Tr. at 72. Ms. Farmer said that Mr. Epstein "flew [her] to New Mexico" and was "inappropriate" with her. Id. She was reluctant to go into details about her experience with Mr. Epstein. Id. at 73. Ms. Farmer opposes Mr. Epstein's pretrial release because she believes other

10

Epstein victims would "continu[e] to be victimized" and that Mr. Epstein's wealth and privilege and notoriety would make it difficult for "[other] victims to come forward." Id. at 72.

Ms. Courtney Wild was introduced by her counsel, Brad Edwards, and said she was "sexually abused by Jeffrey Epstein starting at the age of 14." Id. at 73-74. She asked the Court to "keep [Mr. Epstein] in detention [] for the safety of any other girls out there that are going through what [she's] going through." Id. at 74. Ms. Wild said that Mr. Epstein is a "scary person to have walking the streets." Id.

- **Mr. Epstein Poses A Threat to Additional Young Girls If He Is Released**

At the remand/release hearing on Monday, July 15, 2019, as noted, the Court heard poignant testimony from two of Mr. Epstein's alleged victims about their fears and anxiety over his potential release, even if under strict conditions of home confinement. The Court is also concerned for new victims.

Mr. Epstein's alleged excessive attraction to sexual conduct with or in the presence of minor girls – which is said to include his soliciting and receiving massages from young girls and young women perhaps as many as four times a day – appears likely to be uncontrollable. See United States v. Minnici, 128 F. App'x 827, 829–30 (2d Cir. 2005) (defendant's alleged sex crimes were "of an addictive sexual nature that cannot be suppressed simply by a restrictive set of bail conditions"). Accordingly, Mr. Epstein's past sexual conduct is not likely to have abated or been successfully suppressed by fierce determination, as his Defense Counsel suggests. Defense Counsel contends that: "[H]e wasn't a predator that couldn't control his conduct. He disciplined himself." 7/15/19 Tr. at 31-32. Defense Counsel also argues that "appreciating the gravity of these charges . . . putting aside the age of these witnesses and putting the consent issue aside, it's not like [Epstein is] an out-of-control rapist." 7/15/19 Tr. at 36. It seems fair to say that

11

Mr. Epstein's future behavior will be consistent with past behavior, including the trove of "lewd photographs of young-looking women or girls," which were recently uncovered during the July 6-7, 2019, search of Mr. Epstein's East 71st Street mansion. See Dkt. 11, Ex. 1 at 9. The search results suggest the "possibility that defendant could target another vulnerable victim." See United States v. Baker, 349 F. Supp. 3d 1113, 1135 (D.N.M. 2018) (where the defendant was alleged to specifically target "vulnerable women" and where he attempted to contact an alleged victim, the court was persuaded that the defendant "would be a danger to society if released").

Despite having been convicted of the above mentioned (two) Florida sex crimes (in 2008) involving an underage girl, Mr. Epstein, as noted, maintained at his New York residence a "vast trove" of sexually suggestive photographs of nude underage and adult girls. Dkt. 11, Ex. 1 at 9. That is, during the July 6-7, 2019 authorized search of Mr. Epstein's NYC residence, the FBI found a "substantial collection of photographic trophies of his victims and other young females." Dkt. 11 at 10. This evidence includes compact discs labeled "Young [Redacted Name] + [Redacted Name]," "Misc nudes 1," and Girl pics nude." Id. The Government contends that this evidence includes hundreds or perhaps thousands of "sexually suggestive photographs" of nude underage girls and women, and that it is corroborative in nature. Id. And, it is consistent with victim recollections of the inside of Mr. Epstein's residence. Dkt. 11, Ex. 1 at 9. This newly discovered evidence also suggests that Mr. Epstein poses "ongoing and forward-looking danger." See Dkt. 11 at 10; see also Baker, 349 F. Supp. 3d at 1135; United States v. Goodwin, 2015 WL 6386568, at *3 (W.D. Ky. Oct. 21, 2015).

- **The § 1591 Presumption Of Pretrial Remand Reflects The Seriousness Of Mr. Epstein's Alleged Crimes**

The significant harms and dangers of sex crimes involving minors "animated [] Congress to create the statutory presumption of detention." United States v. Hardy, 2019 WL 2211210, at

*10 (D.D.C. May 22, 2019). The presumption of remand "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010). Other serious offenses that are accompanied by the presumption of remand are: Kidnapping (18 U.S.C. § 1201); Aggravated Sexual Abuse (18 U.S.C. § 2241); Sexual Abuse (18 U.S.C. § 2242); Offenses Resulting in Death (18 U.S.C. § 2245); Sexual Exploitation of Children (18 U.S.C. § 2251); Selling or Buying of Children (18 U.S.C. § 2251); Production of Sexually Explicit Depictions of a Minor for importation into the United States (18 U.S.C. § 2260); Coercion and Enticement (18 U.S.C. § 2422); Transport of Minors (18 U.S.C. § 2423); Use of Interstate Facilities to Transmit Information About a Minor (18 U.S.C. § 2425). 18 U.S.C. § 3142(e)(3)(E).

The presumption of remand does not disappear even when rebutted. Martir, 782 F.2d at 1144. If the defendant comes forward with evidence that he will not endanger the community or flee the jurisdiction, the presumption "is not erased." See United States v. Dominguez, 783 F.2d 702, 707 (7th Cir. 1986). "Rather, the presumption remains in the case as an evidentiary finding militating against release, to be weighted along with other evidence." United States v. Hir, 517 F.3d 1081, 1086 (9th Cir. 2008); see also Martir, 782 F.2d at 1144 ("The concern underlying the presumption applies to the general class of defendants charged with one of the specified offenses—not merely to defendants who fail to produce rebuttal evidence. Were the presumption . . . to vanish upon *any* showing . . . , courts would be giving too little deference to Congress' findings regarding this class) (emphasis in original).

- **The U.S. Pretrial Services Department Recommends To The Court That Mr. Epstein Continue to Be Remanded**

The Pretrial Services report, dated July 8, 2019, concludes, following Pretrial Services' interview of Mr. Epstein, that "[t]here is no condition or combination of conditions that [can]

reasonably assure . . . the safety of the community" if Mr. Epstein is released. Pretrial Services Report, dated July 8, 2019, at 4. Pretrial Services also concluded that Mr. Epstein is a flight risk and recommends that he be detained for that reason as well. Id.

In support of its assessment of Mr. Epstein's dangerousness, Pretrial Services cites the following: the "Nature of [Mr. Epstein's currently charged] Instant Offence," i.e., sex trafficking and conspiracy involving minor girls; Mr. Epstein's "Prior Arrests," e.g., in Florida in 2006; Mr. Epstein's "History [and] Conviction Involving [a] Sex [Offense]," which principally refers to Defendant's 2008 conviction(s) for procuring a person under the age of 18 for prostitution (a felony) and for solicitation of prostitution (also a felony); Mr. Epstein's status as a registered sex offender in New York, Florida and the Virgin Islands; and Mr. Epstein's "Pattern of Similar Criminal Activity History." Id.

- **The Seriousness Of The Crimes That Mr. Epstein Has Been Charged With Is Also Reflected In The Fact That The Crimes Involve Minor Children**

Mr. Epstein is said by the Government to be "a serial sexual predator" who allegedly victimized dozens (or more) of minor girls, including a 14 year old.[1] He was involved in and undertook the alleged sexual activity in several locations, including, his mansion in Manhattan and his estate in Palm Beach, Florida. Indictment ¶ 2. By "actively encourage[ing] certain of his [minor] victims to recruit additional girls to be similarly sexually abused," Mr. Epstein is said to have "created a vast network of underage victims for him to exploit." Dkt. 11, Ex. 1 at 2.

The Government alleges that Mr. Epstein "intentionally sought out—and knew that he was abusing—minors. Indeed, in some instances, his victims expressly told him they were

---

[1]  Mr. Epstein is reported to have remarked that: "I'm not a 'sexual predator,' I'm an 'offender' . . . It's the difference between a murderer and a person who steals a bagel." Amber Southerland, Billionaire Jeffrey Epstein: I'm a sex offender, not a predator, New York Post, Feb. 25, 2011.

14

underage before or during the period in which he abused them." Id. The crimes with which Mr.

Epstein is charged carry a maximum sentence of 45 years of incarceration. Id. at 5. "[T]he

deprivation of liberty imposed by imprisonment makes that penalty the best indicator of whether

the legislature considered an offense to be . . . 'serious.'" United States v. Dugan, 667 F.3d 84,

86 (2d Cir. 2011) (quoting Lewis v. United States, 518 U.S. 322, 326 (1996)).

And, the crimes Mr. Epstein has been charged with are among the most heinous in the

law principally, in the Court's view, because they involve minor girls. 18 U.S.C. § 3142

(e)(3)(E); see also Roger Przybylski, Chapter 5: Adult Sex Offender Recidivism, Sex Offender

Management Assessment and Planning Initiative ("**[R]esearchers widely agree that observed

recidivism rates are underestimates of the true reoffense rates of sex offenders**. Hidden

offending presents significant challenges for professionals working in sex offender management

as it is difficult to know whether offenders who appear to be nonrecidivists based on official

records are truly offense free.") (emphasis in original).

- **Mr. Epstein Or His Representatives Have Intimidated, Threatened, And/Or Made Payments To Potential Witnesses**

The Government's evidence includes: (i) Florida police reports describing harassment

and intimidation of witnesses involved in the Florida state criminal investigation of Mr. Epstein

in 2006, and (ii) emails, dated September 13, 2007 and September 19, 2007 (attached hereto),

from Mr. Epstein's former counsel to Federal prosecutors in Florida discussing the "option" of

Mr. Epstein pleading guilty to witness tampering, harassment, and/or obstruction of justice.

A Palm Beach Police Incident Report, dated July 19, 2006, states that one of Mr.

Epstein's victims reported that Mr. Epstein's representative said to her: **"Those who help [Mr.

Epstein] will be compensated and those who hurt [Mr. Epstein] will be dealt with."** Dkt. 11,

Ex. 3 at 2 (emphasis added.) The Report also states: "[Mr. Epstein's representative] assured [the

15

victim that] she would receive monetary compensation for her assistance in not cooperating with law enforcement." Id. Another (undated) Palm Beach Police Incident Report states that the parent of one of Mr. Epstein's alleged victims contacted the Palm Beach Police to report that Mr. Epstein's private investigator had aggressively driven the parent's car off the road. Dkt. 11, Ex. 2 at 1. This same Report states that the parent of another victim reported being "followed aggressively" by Mr. Epstein's private investigator. Id.

The Government contends that these reports together "suggest that an associate of Epstein's was offering to buy victims' silence during the course of the prior investigation," and demonstrate Mr. Epstein's "willingness to use intimidation and aggressive tactics in connection with a criminal investigation." Dkt. 11 at 11.

The Government also submits e-mail evidence (attached to this Order as Exhibit 1) of plea discussions in 2007 between Florida federal prosecutors and Mr. Epstein's attorneys that confirm that Mr. Epstein considered pleading guilty to witness tampering, harassment and/or obstruction of justice in a case involving alleged sex crimes with minor girls. On September 13, 2007, prosecutors wrote to Mr. Epstein's counsel that they have been "spending some quality time . . . looking for misdemeanors [that Mr. Epstein could plead guilty to]," including 18 U.S.C. § 1512(d), a Federal witness tampering statute (a felony) and 18 U.S.C. § 403, a Federal statute criminalizing the violation of the privacy protection of child victims and child witnesses (a misdemeanor). Doe v. United States, 08 Civ. 80756, (S.D. Fla.), Dkt. 361-11. Epstein's counsel replied: "Already thinking about the same statutes." Id. On September 18, 2007, a Federal prosecutor told Mr. Epstein's counsel that if Mr. Epstein pled guilty to obstruction of justice, the factual proffer "could rely on the incident where Mr. Epstein's private investigators followed [a victim's] father, forcing [him] off the road." Id., Dkt. 361-10; see also supra p. 15. On September

19, 2007, Mr. Epstein's counsel proposed that Mr. Epstein admit that he verbally harassed victims or the family of victims in connection with his "attempt to delay their voluntary receipt of process" in a civil action against Mr. Epstein, in violation of a Federal witness tampering statute. Doe, Dkt. 361-9.

And, the Government has recently contended that, on November 28, 2018 and on December 3, 2018 – very soon after the publication of a 3-part investigative report in the Miami Herald (authored by Julie K. Brown) relating to Mr. Epstein's Florida Non-Prosecution Agreement, dated September 24, 2007 – Mr. Epstein paid $100,000 to "a company founded and run by [Individual I]," and he paid $250,000 to [Individual II]. Dkt. 23 at 1. The Government states that Individual I was "a potential co-conspirator—[] for whom Epstein obtained protection in [] the NPA." Id. Individual I was named and featured prominently in the Miami Herald. See, e.g., Julie K. Brown, "Even From Jail, Sex Abuser Manipulated The System. His Victims Were Kept in The Dark, Miami Herald, Nov. 28, 2018.

The Government states that Individual II was also "a potential co-conspirator—[] for whom Epstein also obtained protection in [] the NPA." Dkt. 23 at 2. She is "one of the employees identified in the Indictment, which alleges that she and two other identified employees facilitated the defendant's trafficking of minors by, among other things, contacting victims and scheduling their sexual encounters with the defendant at his residences in Manhattan and Palm Beach, Florida." Id. at 2. Individual II was also named and featured prominently in the Miami Herald report.

The Government states there is good reason to infer that Mr. Epstein was attempting to "influence [these two] individuals who were close to him during the time period charged in this case and who might be witnesses against him at a trial." Dkt. 11 at 11. "Neither of these

payments appears to be recurring or repeating during the approximately five years of bank records presently available to the Government. This course of action, and in particular its timing, suggests the defendant was attempting to further influence co-conspirators who might provide information against him in light of the recently re-emerging allegations." Id.

A court may order detention if there is a serious risk that the defendant will attempt to threaten, injure, or intimidate a prospective witness or juror. 18 U.S.C. § 3142(f)(2)(B). Even a single incident of witness tampering has been a "traditional ground for pretrial detention by the courts." LaFontaine, 210 F.3d at 132-34 (affirming then-U.S. District Judge Michael B. Mukasey's denial of bail to a defendant who had met with a prospective witness in an effort to persuade the witness to give untruthful testimony and where there was "no evidence of influence, harassment or intimidation"); see also United States v. Singh, 2012 WL 3260232, at *3 (E.D.N.Y. Aug. 8, 2012).

- **Mr. Epstein Has Not Always Been Compliant With His Legal Obligations As A Registered Sex Offender**

Defense counsel has contended that Mr. Epstein has been "scrupulously fulfill[ing] his obligations in every jurisdiction in which he was required to register [as a sex offender]," since his 2008 Florida convictions. Counsel argues that this shows that he "is no longer a danger to anyone and will faithfully obey all conditions of release if ordered." Dkt. 6 at 3.

The record shows that Mr. Epstein has challenged his sex offender "level" in at least one jurisdiction since 2008 in an effort to minimize his reporting obligations. And, one recent press account states that Epstein is not in compliance in New York State. See Elizabeth Rosner, Tina Moore, Larry Celona, and Bruce Golding, NYPD let convicted pedophile Jeffrey Epstein skip judge-ordered check-in, New York Post, July 10, 2019 ("July 10, 2019 NY Post Article")

18

("Jeffrey Epstein never once checked in with City cops in eight-plus years since a Manhattan judge ordered him to do so every 90 days").

Mr. Epstein is a Level III sex offender in New York State which is the highest category of risk to reoffend. This designation requires that Mr. Epstein report his presence in New York to law enforcement authorities every 90 days. As discussed at the July 15, 2019 bail hearing, counsel for Mr. Epstein made an application in New York State Supreme Court in 2011 to reduce Epstein's sex offender registration status from Level III to Level I. If granted, this reduction would have allowed Mr. Epstein to avoid his reporting obligations. In a Sex Offender Registration Act Hearing on January 11, 2018, held before the Honorable Ruth Pickholz, Mr. Epstein's application was (firmly) denied, principally because it had been established by the Board of Examiners of Sex Offenders. See People v. Epstein, Indict. # 30129/2010, (N.Y. Sup. Ct.), SORA Hearing Transcript, dated Jan. 18, 2011.

At the hearing, New York County Assistant District Attorney Jennifer Gaffney joined in Defense Counsel's appeal to review and overturn the decision of the Board of Examiners of Sex Offenders and achieve a downward modification of Mr. Epstein's sex offender status. Id. at 2-15. Judge Pickholz appeared to be stunned by the joint Defense Counsel/District Attorney application, stating: "I am just a little overwhelmed that the People are making this application. . . . I have done many SORAs much less troubling than this one where the People would never make a downward [adjustment] argument like this. . . . I have never seen the prosecutor's office do this. I have to tell you, I am shocked." Id. at 4-5. Judge Pickholz also ordered Mr. Epstein to report as a Level III sex offender every 90 days in New York. Id. at 12. "I am sorry [Mr. Epstein] may have to come here every 90 days. He can give up his New York home [on East 71st. St.] if he does not want to come every 90 days." Id. Epstein appealed but Judge Pickholz's decision

was unanimously affirmed, on November 17, 2011, by a panel of five judges of the Appellate

Division of the New York State Supreme Court. People v. Epstein, 89 A.D.3d 570, 933 N.Y.S.2d

239 (N.Y. App. Div. 2011).

Notwithstanding Judge Pickholz's order, according to a July 10, 2019 investigative report

by the New York Post, as noted, Mr. Epstein has never reported as a sex offender to New York

law enforcement. See July 10, 2019 NY Post Article. "The NYPD cop assigned to monitor

Epstein has repeatedly complained to [the New York County District Attorney's] Sex Crimes

Unit that Epstein wasn't in compliance, according to a source familiar with the matter." Id. Mr.

Epstein's alleged failure to comply with his New York sex offender obligations would appear to

undermine defense counsel's premise that Mr. Epstein's "perfect compliance" and "meticulous

obedience," Dkt. 6 at 1, 5, to his sex offender registration obligations should lead to his release.

See LaFontaine, 210 F.3d at 135 n.6 (where the Court ordered detention noting that the

defendant "had previously disregarded court orders").

The Court has also read the story in the July 17, 2019, New York Post in which attorney

Brad Edwards contends that while Epstein was serving his Florida state sentence (after pleading

guilty to procuring a minor under 18 for prostitution and solicitation of prostitution), Epstein was

allowed to leave the jail on work release. While on work release "[h]e was having . . . female

visitors . . . and continuing to engage in . . . [sexual] conduct . . . while he was in 'jail'." Mr.

Edwards is counsel to one of Mr. Epstein's victims. See Reuven Fenton and Kate Sheehy, Jeffrey

Epstein had sex den while serving time: lawyer, New York Post, July 16, 2019. The Court is also

aware of an article published by Palm Beach CBS local news which reports that the Palm Beach

County Sherriff's Office "disputes [the] claim that Jeffrey Epstein had sex on work release." A

spokeswoman for the sheriff's office is quoted as saying "If he violated any conditions of his

release he would have been brought back to the Stockade and work release would have been

terminated." Chuck Weber, PBSO disputes claim that Jeffrey Epstein had sex on work release,

CBS 12 News, July 17, 2019.

- **New Mexico, Florida And The Virgin Islands**

With respect to Mr. Epstein's sex offender status in New Mexico, Defense Counsel has

submitted a letter, dated August 19, 2010, from Regina Chacon, Assistant Bureau Chief, Law

Enforcement Record Bureau of the New Mexico Department of Public Safety, which states that

Mr. Epstein "is not required to register [as a sex offender] with the State of New Mexico at this

time for [his] 2008 Florida conviction of Procuring [a] Person Under 18 for Prostitution." Dkt.

25, Ex. A. The Court requested from the Defense all application materials that Mr. Epstein may

have submitted to the New Mexico Department of Public Safety, believing that the Department

would not initiate the waiver of Mr. Epstein's sex offense registration on its own. No such

materials have been received by the Court as of this date.

The Court understands that Mr. Epstein is also registered as a sex offender in the Virgin

Islands (Level I) and in Florida (Level I). It has received no materials from the Defense

regarding sex offender applications or proceedings in those two jurisdictions.

In sum, based upon all of the proffers and evidence set forth at pp. 10-21 above, the Court

finds by clear and convincing evidence that Mr. Epstein poses a danger to other persons and to

the community.

### G. Mr. Epstein Also Poses A Risk Of Flight

In the section that follows, the Court considers "risk of flight" even though it has already

determined that Mr. Epstein presents a danger to the community. "[A] finding of either danger

to the community or risk of flight will be sufficient to detain the defendant pending trial."

21

United States v. King, 849 F.2d 485, 488 (11th Cir. 1988) (quoting United States v. Portes, 786 F.2d 765 (7th Cir. 1985)). The Court finds that the Government has shown by a preponderance of the evidence that Mr. Epstein is a flight risk.

The factors to be considered in analyzing risk of flight are the same factors that apply when analyzing dangerousness. They are: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the person's character and financial resources; and (4) "the seriousness of the danger posed by the defendant's release." 18 U.S.C. § 3142(g). "The weight afforded to each factor under section 3142(g) is within the 'special province' of the district court." Paulino, 335 F. Supp. at 610.

At the outset, it should be noted that the Pretrial Services Report, dated July 12, 2019, concludes that: "The defendant poses a risk of nonappearance for the following reasons:

1. [Mr. Epstein's] Extensive foreign travel and possession of travel documents

2. [Mr. Epstein's] Residential and Financial Ties outside this District and Country

3. [Mr. Epstein's] Employment ties outside this country

4. [Mr. Epstein's] Unexplained assets

5. [Mr. Epstein's] Criminal History including [his] conviction for a [] sex offense [with minors in Florida in 2008]." Pretrial Services Report, dated July 12, 2019 at 4.

- **The Crimes Charged Against Mr. Epstein**

Mr. Epstein has been charged with among the most serious crimes recognized by U.S. Federal law. The Government has alleged that Mr. Epstein intentionally sought out and sexually abused minor girls, including those "particularly vulnerable to exploitation." Dkt. 11, Ex. 1, at 2. He did this in multiple locations, including New York and Palm Beach. Id. And, Mr. Epstein allegedly "worked and conspired with others, including employees and associates who facilitated

22

his [unlawful] conduct, by . . . contacting victims and scheduling their sexual encounters."
Indictment ¶ 4. These crimes, as already noted, carry a maximum sentence of 45 years of
incarceration and give rise to a presumption of pre-trial remand. 18 U.S.C. § 3142 (e)(3)(E); see
United States v. Hardy, 2019 WL 2211210, at *10 (D.D.C. May 22, 2019) ("The significant
harms and dangers of these crimes animated the Congress to create the statutory presumption of
detention."). The nature and circumstances of the crimes charged and the severity of the potential
punishment support a finding that Defendant poses "a serious flight risk and that no conditions
can be set to reasonably assure his appearance for trial."  United States v. Cilins, 2013 WL
3802012, at *2 (S.D.N.Y. July 19, 2013).

- **Weight Of The Evidence**

The Government's evidence against Mr. Epstein appears strong. The evidence includes
testimony of victims, some of whom were minor girls when they were allegedly sexually abused
by Mr. Epstein; other witnesses, including potential coconspirators; physical evidence, including
passports reflecting extensive foreign travel; sexually suggestive photographs of nude underage
girls; plea discussions; and police reports describing witness tampering and intimidation. See,
e.g., United States v. Fama, 2013 WL 2467985, at *3 (S.D.N.Y. June 7, 2013) ("the Court
recognizes the difficulty inherent in assessing the Government's case before trial, and is mindful
not to reach any conclusions about [the Defendant's] guilt or innocence. Indeed, some courts
have described the weight of the evidence factor as the 'least important' of the § 3142(g) factors
for these reasons."); see also Hir, 517 F.3d at 1090.

- **History And Characteristics Of The Defendant Including His Financial Resources**

Mr. Epstein pled guilty to two state felonies involving minor girls in Florida.  He also
held plea discussions regarding witness tampering in Florida in 2008. He is a registered Level III

sex offender in New York and a registered sex offender in Florida (Level I) and the Virgin Islands (Level I). Mr. Epstein is 66 and is reported to be a self made multi-millionaire. He did not graduate from college. Mr. Epstein's vast wealth, including substantial liquid assets, multiple residences, private plane(s), a $8,672,823 residence in Paris, France, and relatively limited family ties to the United States in the sense that he is single with no children and his parents are deceased. He has a brother who Defense counsel asserts has offered to serve as a guarantor for Mr. Epstein by pledging his home in West Palm Beach, Florida. (The Court notes that the Pretrial Services Report, dated July 12, 2019, states that "[t]he defendant stated he maintains minimal contact with his brother, Mark Epstein, and that his exact location is unknown at this time." Pretrial Services Report at 2.)

Mr. Epstein engages in extensive overseas travel often relying on his own plane(s). The Government argues persuasively that "there is an extraordinary risk of flight, particularly given the defendant's exorbitant wealth, his ownership of and access to private planes capable of international travel, and his significant international ties. Indeed, the arrest of the defendant occurred when he arrived in the United States on his private jet after having returned from a multi-week stay abroad." Dkt. 11, Ex. 1 at 1. "[I]n the past 18 months alone, the defendant has traveled abroad, via private jet, either into or out of the country on approximately more than 20 occasions." Id. at 3.

In a recent search of Defendant's New York City home, law enforcement seized an expired Austrian passport bearing Mr. Epstein's photo but not his name. (The passport is in another name.) The Austrian passport lists residence in Saudi Arabia. According to the Government, Defense counsel declined to respond when asked by the Government if the

"Defendant is currently, or has been in the past, a citizen or legal permanent resident of a country

other than the United States." Dkt. 23 at 2.

Defense counsel contends that Defendant has one active passport that was surrendered

and that "Mr. Epstein has no foreign passports." Dkt. 6 at 3 n. 3. With regard to the Austrian

passport, the Defense explains that "Epstein . . . acquired the passport in the 1980s, when

hijackings were prevalent, in connection to Middle East travel. The passport was for personal

protection in the event of travel to dangerous areas, only to be presented to potential kidnapers,

hijackers or terrorists should violent episodes occur." Dkt. 24 at 8. Details about how the

passport was procured by Mr. Epstein in the name of another individual were not provided and

are not known to the Government. See Dkt. 23 at 2 ("The Government is attempting to obtain

additional information about the Foreign Passport, including how it was obtained and whether

the passport is genuine or fabricated. But the defendant's possession of what purports to be a

foreign passport issued under an alias gives rise to the inference the defendant knows how to

obtain false travel documents and/or assume other, foreign identities. This adds to the serious

risk of flight posed by the defendant."). The Government also argues that "the passport contains

numerous ingress and egress stamps, including stamps that reflect use of the passport to enter

France, Spain, the United Kingdom, and Saudi Arabia in the 1980s." Dkt. 30. By submission

dated July 18, 2019, the Defense explains: "Epstein was given the passport at issue by a friend . .

. He never used the document to travel internationally and never presented it to any immigration

or customs authority. The passport stamps, predating his receipt of the document, do not reflect

Mr. Epstein's entries or exits." Dkt. 31.

Defense counsel has submitted a one page document called "Asset Summary - June 30,

2019." It indicates that Epstein has cash in the amount of $56,547,773; fixed income valued at

25

$14,304,679; equities valued at $112,679,138; hedge funds and private equity valued at
$194,986,301; properties located at 9 East 71st Street, NY, NY 10021 valued at $55,931,000, 49
Zorro Ranch Road, Stanley, New Mexico 87056 valued at $17,246,208, 358 El Brillo Way, Palm
Beach, Florida 33480 valued at $12,380,209, 22 Avenue Foch, Paris France 75116 valued at
$8,672,823, Great St. James Island No. 6A USVI 00802 (parcels A, B, and C) valued at
$22,498,600 and Little St. James Island No. 6B USVI 00802 (parcels A, B, and C). Dkt. 14 at
18. The Court has advised Defense counsel that this "cursory" asset statement is insufficient to
support a bail package for the reasons, among others, that it is not verified and does not show
expenses, indebtedness, or liabilities.

Law enforcement has informed the Government that a safe in the Defendant's New York
home very recently contained "more than $70,000 in cash . . . 48 loose diamond stones, ranging
in size from approximately 1 carat to 2.38 carats, as well as a large diamond ring. The
Government is currently unaware of whether the Defendant maintains similar [amounts] of cash
and/or jewels at his multiple properties, or in other locations. Such ready cash and loose
diamonds are consistent with the capability to leave the jurisdiction at a moment's notice." Dkt.
23 at 3.

The Defendant's vast wealth and influential contacts have provided him with the means
to pay individuals to assist him in unlawful endeavors, including potentially fleeing the
jurisdiction. In the past, "the Defendant worked with others, including employees and associates
who facilitated his exploitation of minors, by among other things, contacting victims and
scheduling their sexual encounters with the defendant, both in New York and in Florida." Dkt.
11, Ex. 1 at 2.

David Boies, who, as noted, represents identified victims in this case, advised the Court

that while a civil case was proceeding against the Defendant "we had situations in which we had

witnesses who were cooperating with us and then were contacted by either Mr. Epstein or his

lawyers and who then stopped cooperating with us." 7/15/19 Tr. at 71; see also United States v.

Boustani, 356 F.Supp.3d 246 (E.D.N.Y. 2019) ("[T]he combination of Defendant's alleged

deceptive actions, access to substantial financial resources, frequent international travel,

complete lack of ties to the United States, and extensive ties to foreign countries without

extradition demonstrates Defendant poses a serious risk of flight." ); United States v. Epstein,

155 F.Supp.2d 323, 326 (E.D. Penn. 2001) ("The crucial factor, however, is defendant's lack of

ties to the United States and his extensive ties to Brazil with which no extradition treaty exists.

In our view, his forfeiture of $1million worth of assets in the United States would not deter him

from flight when in Brazil he has significant wealth, a lucrative job, the presence of his family,

and insulation from ever being forced to stand trial.").

Viewing the totality of the circumstances, the Court finds that the Government has shown

by a preponderance of the evidence that Defendant is a serious risk of flight and that no

conditions can be set that will reasonably assure his appearance at trial. "While other judges in

this district have found that an armed security guard may be sufficient to assure a defendant's

appearance, even when he is a serious risk of flight . . . this Court does not believe that that

condition, even coupled with the additional conditions proposed, would be sufficient." United

Cilins, 2013 WL 3802012, at *3.

- **The Danger Posed By The Defendant's Release**

As demonstrated infra, Mr. Epstein's dangerousness is considerable and includes sex

crimes with minor girls and tampering with potential witnesses. The discussion at pp 10-21 is

27

incorporated here by reference. See Minnici, 128 F. App'x at 829–30 ("the alleged activities [we]re of an addictive sexual nature that cannot be suppressed simply by a restrictive set of bail conditions"); see also Millan, 4 F.3d at 1049 ("[T]he protection of the community can be assured only by continued detention.").

The Court has carefully considered the issue of Defendant's ability and motivation for fleeing U.S. jurisdiction. The Court finds that the Government has proven by a preponderance of the evidence that, among other things, the Defendant's limited family ties to the United States, his residence in Paris, his extensive overseas travel, his significant wealth and his substantial resources (including private planes), and the potential 45 year term of imprisonment that may be imposed should there be a conviction in this case, provide incentive, motive and wherewithal to flee. Indeed, these factors render him a "classic" flight risk. See, e.g., United States v. Abdullahu, 488 F.Supp.2d 433, 445 (D.N.J. 2007) ("After reviewing the totality of the evidence, the Court has reached the inescapable conclusion that the government has proved by a preponderance of the evidence that no condition or combination of conditions exist that will reasonably assure the defendant's appearance at trial. The defendant faces serious criminal charges . . . The defendant faces a potential ten year prison sentence and involuntary deportation. The defendant does not have permanent and longstanding ties to this area, he has the means and incentive to flee and he has family ties and a place to live in an overseas country that will not extradite him to the United States.").

**H. Defendant's Proposed Bail Package**

Having determined that Mr. Epstein is a flight risk (and also a danger to the community), the Court next examines the Defendant's proposed bail package. See 18 U.S.C. § 3142(b)-(f)(2).

The Court finds that the Defendant's proposed bail package is inadequate. Among its deficiencies are these:

**(1)** The bail package is not accompanied or supported by audited or certified financial statements, including details of income and expenses and debt obligations. There is no affidavit from Mr. Epstein. As noted, Defense counsel submitted a cursory one page "Asset Summary - June 30, 2019" on Mr. Epstein's behalf in which he discloses several categories of assets totaling $559,120,954. The Defense states that it "would be impossible for Epstein – given, among other impediments, his detention, inability to quickly access pertinent records, and inability to quickly make a precise valuation of particular assets – to provide a sufficient financial statement by the Court's 5 pm deadline." Dkt. 23 at 4.

The absence of accurate and comprehensive financials, sworn to by the Defendant, does not allow the Court meaningfully to assess Defendants' own proposed bail package nor would it enable the Court to fashion a bail package on its own. The Court would not be able to determine what level of bail – in relation to Epstein's finances – would reasonably assure the Defendant's appearance. Defense counsel proposed at the bail hearing on July 15, 2019 that it would take a few days to prepare accurate financials for Mr. Epstein. He also suggested that he would do so (only) if the Court were agreeable to granting bail. This "offer" appears disingenuous for a person as wealthy and experienced in financial matters as Mr. Epstein. See Tr. 7/15/19 at 50 (Court: "There needs to be a fuller financial picture to know what would be appropriate." Defense Counsel: "Let me be blunt. It was our first effort . . . ."). That Mr. Epstein does not have a financial statement, including liabilities and expenses, readily available is difficult to understand.

**(2)** The defense bail package proposes excessive involvement of the Court in routine aspects of Mr. Epstein's proposed home confinement. This is not the Court's function. See United States v. Zarrab, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016) ("The [bail package] . . . proposed by the defense is not reasonable because, in too many respects, it substitutes judicial oversight and management for (more appropriate) reliance upon trained, experienced, and qualified professionals from the U.S. Bureau of Prisons and the U.S. Marshals Service."). The Defense package components would embroil the Court in issues, among others, relating to the level of force that may be used to secure the Defendant, who may enter the residence, daily reporting by Mr. Epstein, and reporting by so-called Trustee(s) designated to live with and supervise Mr. Epstein. See United States v. Valerio, 9 F. Supp. 3d 283, 295 (E.D.N.Y. 2014) ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties - indeed, the imperfections - of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail.").

**(3)** The Defense proposal to give advance consent to extradition and waiver of extradition rights is, in the Court's view, an empty gesture. And, it comes into pay only after Mr. Epstein has fled the Court's jurisdiction. According to the Government, "The Department of Justice's Office of International Affairs is unaware of any country anywhere in the world that would consider an anticipatory extradition waiver binding. And, of course, the defendant could choose to flee to a jurisdiction with which the United States does not have an extradition treaty." Dkt. 11 at 7.

**(4)** Although the Defense has stated that Mr. Epstein would be agreeable to putting up "any amount" of collateral or signing "any bond" the Court would require, there has, to date,

30

been no concrete pledge of any real assets or any concrete proposal to turnover deeds to real property, or to provide a specific amount of cash. See 7/15/19 Tr. at 50 ("I am authorized to say to the Court that whatever bond you want Mr. Epstein to sign, whether it's $100 million or an amount close to the amount of the assets that we have provided, Mr. Epstein is prepared to sign it.").

The Court, as noted, has no detailed information regarding the extent of the Defendant's assets, including the nature, value and location of all of his assets. There is no mention of any expenses, liabilities, or indebtedness. And, there has been no persuasive Defense counter to the Government's argument that "even were the defendant to sacrifice literally all of his current assets, there is every indication that he would immediately be able to resume making millions or tens of millions of dollars per year outside of the United States. He already earns at least $10,000,000 per year, according to records from Institution-1, while living in the U.S. Virgin Islands, traveling extensively abroad, and residing in part in Paris, France; there would be little to stop the defendant from fleeing, transferring his unknown assets abroad, and then continuing to do whatever it is he does to earn his vast wealth from a computer terminal beyond the reach of extradition." Dkt. 11 at 5 (emphasis omitted). The Defendant, it should also be noted, is already at risk of losing some of his real property because the Indictment contains a forfeiture allegation regarding any property that was used or intended to be used to commit or to facilitate the sex trafficking offenses and that includes, but it is not limited to, the property located at 9 East 71st Street, New York, New York.

**(5)** The appointment and role of "trustees" who will presumably live with Mr. Epstein and monitor his compliance with bail conditions are unacceptably vague. They do not, for example, address the conflict that is created by the salary the "trustees" are earning from the

31

Defendant and their purported role as independent monitors. (The same problem arises in relation to private 24/7 security guards.) This is especially problematic where, as here, it is alleged that employees of the Defendant may have engaged in unlawful acts with and on behalf of the Defendant. According to the Government, "the defendant worked with others, including employees and associates who facilitated his exploitation of minors, by among other things, contacting victims and scheduling their sexual encounters with the defendant, both in New York and in Florida." Dkt. 11, Ex. 1 at 2.

**(6)** "As a fallback," the Defense suggests the utilization of and the funding of a private security guard agency to "virtually guarantee" Mr. Epstein's presence in court and, presumably, also to supervise his behavior. This contingency plan is not a part of Mr. Epstein's 14 point proposal. Nevertheless, the Court is asked by the defense to "revisit" its legal viewpoint as expressed in an earlier decision concerning 24/7 private home security guards.

Each bail package in each case is considered and evaluated on its individual merits by the Court. And, in view of the Court's finding of dangerousness, a new bail proposal likely would be futile. See, e.g., United Ferranti, 66 F.3d at 544 ("No conceivable conditions could ensure the safety of the community."); Orena, 986 F.2d at 632 ("We do not agree that the bail conditions set by the district court eliminate the danger to the community or are superior to detention for purposes of the Bail Reform Act."); United States v. Colombo, 777 F.2d 96, 100 (2d Cir. 1985) ("These conditions are clearly inadequate to protect the public from one found for bail purposes to be a danger to the community.").

32

**Conclusion & Order**

Based upon the forgoing, the Government's motion for remand (detention) is granted and

the Defense motion for pretrial release is denied.

Dated: New York, New York
July 18, 2019

**RICHARD M. BERMAN, U.S.D.J.**